**Martsay BOLDER, Plaintiff,**

v.

**Bill ARMONTROUT, et al., Defendants.**

**No. 86–4539–CV–C–5.**

United States District Court,
W.D. Missouri,
Central Division.

April 26, 1989.

Gardiner B. Davis, Spencer, Fane, Britt & Browne, Kansas City, Mo., for plaintiff.

Stephen Hawke, Office of Atty. Gen., Jefferson City, Mo., for defendants.

## ORDER

SCOTT O. WRIGHT, Chief Judge.

This petition for writ of habeas corpus was filed pursuant to 28 U.S.C. § 2254 by Martsay Bolder, an inmate in custody at the Missouri State Penitentiary, Jefferson City, Missouri. The petitioner seeks to vacate his sentence of death entered after a conviction for capital murder. The conviction and sentence were affirmed on direct appeal to the Missouri Supreme Court. *State v. Bolder,* 635 S.W.2d 673 (Mo.1982) (en banc), *cert. denied,* 459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983). Petitioner

subsequently filed a Missouri Rule 27.26 petition in Missouri Circuit Court. This request for post-conviction relief was denied. The denial was affirmed by the Missouri Court of Appeals. *Bolder v. State,* 712 S.W.2d 692 (Mo.Ct.App.1986).

The instant petition contains numerous claims. The Court will address these contentions seriatim. The facts relevant to each claim will be outlined as necessary. For the reasons set forth in this order, said petition is GRANTED and the sentence of death is VACATED.

## I. *Standard of Review*

■ The standard of review for habeas corpus petitions filed by prisoners in state custody is set out in 28 U.S.C. § 2254(d). A written determination after a hearing on the merits of a factual issue, made by a state trial or appellate court of competent jurisdiction, is presumed to be correct unless one of the conditions set forth in 28 U.S.C. § 2254(d)(1)–(7) is found to exist. If no such condition exists, or unless the state court determination is "[n]ot fairly supported by the record," 28 U.S.C. § 2254(d)(8), the petitioner must establish by convincing evidence that the factual determination by the state court was erroneous. *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981).

This presumption of correctness does not apply to legal findings or to mixed questions of law and fact. Factual issues involve "[w]hat are termed basic, primary, or historical facts: facts 'in the sense of recital of external events and the credibility of their narrators ...'" *Townsend v. Sain,* 372 U.S. 293, 310 n. 6, 83 S.Ct. 745, 755 n. 6, 9 L.Ed.2d 770 (1963) (*quoting Brown v. Allen,* 344 U.S. 443, 506, 73 S.Ct. 397, 445, 97 L.Ed. 469 (1953)). Mixed questions of law and fact, however, involve "[t]he application of legal principles to the historical facts of [the] case." *Cuyler v. Sullivan,* 446 U.S. 335, 342, 100 S.Ct. 1708, 1714, 64 L.Ed.2d 333 (1980). "Where the ascertainment of the historical facts does not dispose of the claim but calls for the interpretation of the legal significance of such facts ... the district judge must exercise his own judgment on this blend of facts and legal values. Thus, so-called mixed questions of the application of constitutional principles to the facts is found to leave the duty of adjudication with the federal judge." *Brown v. Allen,* 344 U.S. 443, 507, 73 S.Ct. 397, 446, 97 L.Ed. 469 (1953).

## II. *Ineffective Assistance of Trial Counsel*

Petitioner contends that his counsel's performance at the sentencing phase of his trial was constitutionally deficient in that counsel failed to offer certain mitigating evidence during the sentencing phase of that trial, and failed to investigate further mitigating evidence. Specifically, petitioner contends the following mitigating evidence was available but not utilized by his counsel: his age; evidence of his development problems during childhood; his mental and learning deficiencies; his good character, and the absence of any violent or aggressive tendencies as a child; his problems with the environment at the penitentiary; evidence contained in a psychiatric examination; evidence of the victim's character and reputation for violence and petitioner's fear of the victim; the failure to allow petitioner to take the witness stand to plea for mercy.

Petitioner claims counsel erred in not investigating the following evidence: testimony of family members or other witnesses who knew him and would have testified to the emotional trauma he suffered during childhood and his difficulty in adjusting to prison life; and testimony of character witnesses.

Respondent contests petitioner's allegation that his counsel's performance in the sentencing phase was constitutionally deficient and, further, asserts that the majority of petitioner's claims of ineffective assistance of counsel are procedurally barred.

### A. Procedural Bar.

Respondent contends that there is an independent state procedural bar to review of the majority of petitioner's ineffective assistance of counsel claims. Some background is necessary to address this point.

Before the Missouri Rule 27.26 trial court, petitioner made a generic allegation that he received ineffective assistance of trial counsel at the penalty phase because trial counsel declined to call character witnesses on petitioner's behalf.[1] Petitioner's 27.26 motion was denied on all grounds.

On appeal of the Circuit Court's denial of his 27.26 petition, petitioner assigned the following error with respect to his ineffective assistance of counsel claim:

## I.

THE TRIAL COURT ERRED IN DENYING APPELLANT'S CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL BECAUSE APPELLANT'S TRIAL COUNSEL'S PERFORMANCE DID NOT CONFORM TO THE STANDARD OF A REASONABLY COMPETENT ATTORNEY IN THE SAME CIRCUMSTANCES, THE ATTORNEY–CLIENT RELATIONSHIP WAS DESTROYED PRIOR TO TRIAL AND THE APPELLANT WAS PREJUDICED THEREBY IN THAT

A) TRIAL COUNSEL FAILED TO INVESTIGATE AND PRESENT EYEWITNESS TESTIMONY;

B) TRIAL COUNSEL FAILED TO PRESENT ANY EVIDENCE ON APPELLANT'S BEHALF DURING THE GUILT OR PENALTY PHASE;

C) TRIAL COUNSEL FAILED TO INVESTIGATE POSSIBLE MITIGATING FACTORS AND TO PRESENT TWO, OBVIOUS MITIGATING FACTORS; AND

D) APPELLANT REQUESTED THE WITHDRAWAL OF HIS COUNSEL AND THE APPOINTMENT OF NEW COUNSEL PRIOR TO, DURING AND AFTER TRIAL DUE TO HIS BELIEF THAT HIS COUNSEL'S REPRESENTATION WAS GROSSLY INADEQUATE.

*Respondent's Ex. H–1* (Appellant's Brief, Statement and Argument) at 21.

The only two allegations of ineffectiveness the Missouri Court of Appeals addressed were the failure to submit any mitigating evidence during the penalty phase of the trial, and the failure to produce evidence that Bolder was of marginal intelligence and 21 years of age at the time of the murder. *Bolder v. State,* 712 S.W.2d 692, 695 (Mo.Ct.App.1986). The Missouri Court of Appeals did not find these arguments persuasive.

■ To properly present a claim of constitutional error to the state court, the petitioner must present both the legal and factual basis for the claim. It is clear from the assignment of error in petitioner's appeal of the denial of his Missouri Rule 27.26 motion that the legal basis for his claim (i.e., ineffective assistance of counsel) was asserted. However, the factual basis for these claims, at least with respect to the enumerated allegations of ineffective assistance present in the instant action but not specifically detailed in the 27.26 appeal, were not presented to the Missouri Court of Appeals.[2] Accordingly, it appears an independent state procedural bar to federal habeas corpus review of these issues exists. *See Benson v. State,* 611 S.W.2d 538, 541 (Mo.Ct.App.1980) (Missouri procedure requires constitutional claim to be presented "at each step of the judicial process"). *See also Stokes v. Armontrout,* 851 F.2d 1085, 1092 (8th Cir.1988) *cert. denied,* —— U.S. ——, 109 S.Ct. 823, 102 L.Ed.2d 812 (1989); *Walker v. Lockhart,* 852 F.2d 379,

---

1. In petitioner's Rule 27.26 *pro se* motion he alleged that he was denied his constitutional right to effective assistance of counsel in the sentencing phase in that counsel refused to call character witnesses who were willing to testify on defendant's behalf and counsel refused to call the defendant to testify on his own behalf. *Respondent's Exhibit F–1* (Appeal of Rule 27.26 Legal File) at 10, 19.

2. The fact that no specific allegations of failure to investigate and develop mitigating evidence were presented to the Court (for example, evidence of petitioner's troubled childhood) is evident from the Missouri Court of Appeals opinion: "The lack of mitigating evidence is attributable to the lack of suitable mitigating evidence rather than a neglect of counsel to present it." *Bolder,* 712 S.W.2d at 695. The transcript of the hearing before this Court reveals, however, that suitable mitigating evidence did exist, it was just not developed.

381 (8th Cir.1988) *cert. denied,* —— U.S. ——, 109 S.Ct. 1551, 103 L.Ed.2d 854 (1989).

Petitioner nonetheless asks this Court to reach the merits of these issues irrespective of the independent state bar to relief. For the reasons to follow, the Court will entertain these issues.

■ The traditional method of circumventing a state procedural bar is to demonstrate "cause" for the failure to raise the issue and actual "prejudice" from its omission. *Amadeo v. Zant,* 486 U.S. 214, 108 S.Ct. 1771, 1776, 100 L.Ed.2d 249 (1988); *Wainwright v. Sykes,* 433 U.S. 72, 87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977). In the case *sub judice,* petitioner contends his counsel was ineffective during the Missouri post-conviction stage because she failed to raise the issues presented in the instant petition. Ineffective assistance of counsel satisfies the cause prong of the *Wainwright* test. *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 2646, 91 L.Ed.2d 397 (1986).[3] The Court agrees that petitioner's post-conviction counsel was ineffective with respect to the omission of mitigating evidence in that she did not present this evidence to the state court as proof of trial counsel's ineffectiveness. The hearing on the instant petition reveals such evidence existed at the time of Bolder's trial. If petitioner's trial counsel is to be deemed ineffective for failing to raise such evidence, appellate counsel is no less so.

Because the Court will detail the aspects of petitioner's representation it feels were inadequate in the passages to follow, it would be redundant to exhaustively support a finding of prejudice at this point. In short, it is this Court's belief that the failure to raise particular evidence in mitigation of petitioner's sentence undermined the reliability of the sentencing function so as to render its result questionable. Needless to say, a sentence of death rendered after a questionable sentencing proceeding sufficiently demonstrates prejudice.

■ One other factor supports the circumvention of the procedural bar in this case; this petition asks for review of the constitutionality of the procedures utilized to impose a sentence of death. In such a case, it is appropriate to bypass procedural default rules to reach the merits of allegations of constitutional error. *Laws v. Armontrout,* 863 F.2d 1377, 1387 n. 10 (8th Cir., 1988) (en banc).

B. The Merits.

The Eighth Circuit has recently spoken on counsel's failure to develop or investigate mitigating evidence:

[T]he absence of mitigating evidence does not inexorably lead to a conclusion of ineffective counsel. One must look further and determine why the mitigating evidence was not produced. If counsel has by neglect failed to discover such evidence, then counsel will be found ineffective. If, however, counsel did not produce the mitigating evidence because, after a reasonable investigation and exercise of professional judgment, he has determined that withholding such evidence is the most strategically sound course, then there has been no ineffectiveness.

*Laws,* at 1385.

Accordingly, the Court must determine what, if any, mitigating evidence was not discovered or introduced by neglect of counsel, and what evidence was excluded after a reasonable investigation and exercise of professional judgment.

In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court addressed trial counsel's duty to investigate. The Court explained:

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchal-

---

**3.** In *Stokes v. Armontrout,* 851 F.2d 1085 (8th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 823, 102 L. Ed.2d 812 (1989), the Court intimated that utilizing ineffective assistance of Rule 27.26 counsel to satisfy the "cause" prong of the *Wainwright* test may be improper when the ineffectiveness claim was not advanced initially at the state level. *Id.* at 1092 n. 8. However, in this case, petitioner advanced a claim of ineffective assistance throughout his state procedure. Accordingly, the concern of *Stokes* is not implicated.

lengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* at 690–91, 104 S.Ct. at 2066. *See also Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986).

A capital sentencing proceeding "[i]s sufficiently like a trial in its adversarial format and the existence of standards for decision," that counsel's role in the two proceedings is comparable—it is "[t]o insure that the adversarial testing process works to produce a just result under the standards governing decision." *Strickland,* 466 U.S. at 686–87, 104 S.Ct. at 2064. It is this Court's duty, therefore, to determine whether petitioner's trial counsel's performance with respect to his treatment of the mitigating evidence available to him, and his decision not to pursue further mitigating evidence, undermines the Court's confidence in the adversarial process by which petitioner was sentenced to death.

*Burger v. Kemp,* 483 U.S. 776, 107 S.Ct. 3114, 3123, 97 L.Ed.2d 638 (1987). Embarking on this review, this Court is guided by the Supreme Court's admonition in *Strickland:*

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

*Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065 (citation omitted).

At the outset, it is important to note that the defense offered no evidence in mitigation of punishment during the sentencing phase of petitioner's trial.[4] Further, as later discussions in this order will reveal, the petitioner was convicted of a murder that pales by comparison in severity and outrageousness to murders for which individuals have been sentenced to death.[5] The victim in this case was another prison inmate who was stabbed following an argu-

**4.** Testimony at the hearing on this matter revealed that counsel for petitioner was a part-time public defender who spent the balance of his time in civil practice. His representation of the petitioner was his first capital case, although he had participated in several felony trials. Counsel met with the petitioner five times prior to his trial for capital murder. Testimony at this hearing revealed that of all the time devoted to petitioner's trial, only one hour was devoted to the sentencing portion. Of that one hour, approximately fifteen minutes were devoted to argument in favor of life. No evidence was presented to the jury in mitigation of punishment. The prosecution put on several witnesses during the sentencing phase, as well as its argument in favor of the death penalty.

**5.** In his dissent to the opinion filed by the Missouri Supreme Court on direct appeal of petitioner's conviction and sentence, Judge Seiler spoke on this issue:

> [I]n my opinion the sentence of death is excessive and disproportionate in this case....

> Any murder is serious and reprehensible, but the murder in the present case is hardly comparable in viciousness or extremes to the murders in the *Trimble* [638 S.W.2d 726 (1982)] and *Shaw* [636 S.W.2d 667 (1982)] cases [the two most analogous cases that were compared to the petitioner's for purposes of proportionality review]. The main similarity is that the instant case also occurred in a place of confinement. If the murder in the present case had occurred in a tavern or on a parking lot or elsewhere outside the prison walls, by someone not in confinement, there would have been no reasonable likelihood, in my opinion, of the prosecutor being able to obtain a capital murder conviction, much less the death penalty. It would work out as a second degree murder case. *State v. Bolder,* 635 S.W.2d 673, 691–92 (Mo.1982) (en banc) (Seiler, J., dissenting in which Bardget, J., concurs).

ment. The victim died some thirty days later of a post-operative infection. The only aggravating circumstance submitted to the jury in its determination of whether the death sentence could be considered was the fact that the killing occurred while the defendant was in the custody of the state.[6] But for the petitioner's incarceration, it is clear that the death penalty would not have been available for this crime.

The absence of several important pieces of mitigating evidence from the sentencing phase of petitioner's trial troubles this Court sufficiently so as to conclude that the sentencing phase cannot "[b]e relied on as having produced a just result." *Strickland*, 466 U.S. at 686, 104 S.Ct. at 2064.

■ First, there is the failure of counsel to submit evidence and a mitigating evidence instruction on petitioner's age at the time of the offense.[7] This factor is clearly set out in the statute as a mitigating circumstance to be submitted to the jury in the determination of whether a defendant should live or die.[8]

Counsel, at the hearing on this matter, justified his failure to offer this evidence on the grounds that he feared a judicial admission of guilt by his client and that it would have subjected the petitioner to damaging cross-examination about the circumstances of the crime. The Court cannot agree.

At the time of petitioner's trial, the controlling statute on cross examination provided that a criminal defendant "[s]hall be liable to cross-examination, as to any matter referred to in his examination in chief." Mo.Rev.Stat. § 546.260 (1978) (amended 1985). "The matter referred to in examination in chief means the things he testifies about." *State v. Williams*, 519 S.W.2d 576, 578 (Mo.Ct.App.1975). Had Bolder

limited his testimony to his age, he would have avoided cross-examination as to responsibility for the crime charged. Furthermore, evidence of petitioner's age could have been submitted in any number of forms and, in any event, was unlikely to be challenged by the state. The failure to provide *any* available mitigating circumstance when one is clearly available cannot be countenanced by this Court.

A decision on whether a particular defendant receives the death penalty is a balancing process in Missouri. Jurors are instructed to weigh mitigating factors against aggravating factors in deciding whether a defendant should live or die. Were this a matter of failing to add one mitigating circumstance to many submitted, this Court would be more hesitant to find prejudice. However, petitioner's counsel put nothing on the scale to balance against the aggravating factors submitted by the state.

■ This Court cannot agree with the Missouri Court of Appeals that there was no prejudice to Bolder because he was present in court and his age was observable. *Bolder v. State*, 712 S.W.2d at 695. Such a conclusion is dangerously speculative given the nature of the sanction at issue. The instructions in the case clearly instruct the jury to only consider those mitigating circumstances *in evidence*. The fact that Bolder may or may not appear youthful could easily be lost on the jury whose attention should be focused on the instructions.

*Woodard v. Sargent*, 806 F.2d 153 (8th Cir.1986) supports a finding of ineffectiveness. In *Sargent*, the Eighth Circuit determined that the failure to offer the mitigating circumstance of "no prior significant criminal activity" to the jury was signifi-

---

6. The state offered as an additional aggravating factor petitioner's prior murder conviction. However, this was utilized in determining if the death penalty *should* be imposed, not whether it *could* be imposed.

7. The allegations of ineffective assistance with respect to this issue have been properly presented to the Missouri courts and are not subject to any argument of a procedural bar.

8. Section 565.012.3 (1978) was the relevant statute at the time of petitioner's trial and outlined the statutory mitigating circumstances available. The section states statutory mitigating factors shall include "[t]he age of the defendant at the time of the crime." Mo.Rev.Stat. § 565.012.3(7) (1978).

cant enough to destroy confidence in the sentencing proceeding and required the sentence of death be vacated. It is significant to note that *Sargent* addressed a sentencing scheme similar to Missouri's in which aggravating and mitigating circumstances are balanced to determine if death is the appropriate punishment. Further, counsel in *Sargent* also failed to offer any evidence in mitigation of the punishment of death.

■ Further, the Court believes counsel's failure to investigate the petitioner's background for any mitigating evidence rendered his performance constitutionally deficient. Petitioner was one of ten children living in a housing project. His mother worked full time and the children were routinely entrusted to the care of older sisters. The evidence at trial revealed that when the petitioner was very young, his parents divorced. His father was an alcoholic who suffered a nervous breakdown when the petitioner was eight to nine years old. On several occasions the father would return to the family home, beat on the door while shouting obscenities, and demand to be let in. These altercations caused a great deal of stress within the family. Further, petitioner's brother was killed at a young age and the evidence revealed that petitioner suffered from learning deficiencies.

This Court has no doubt that this potential testimony would have been relevant mitigating evidence that the sentencer could not have refused to consider and could not have been precluded from consid-

ering had counsel sought to introduce it. *See Hitchcock v. Dugger*, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987); *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).

■ Counsel testified at the hearing on this petition that he had not considered investigating for this evidence.[9] It is this Court's opinion that counsel's decision not to investigate petitioner's family or childhood background was not based on an understanding of controlling law and was not within the range of professionally reasonable judgment. This is not a situation where counsel had made a reasonable investigation that rendered the decision not to further investigate acceptable. Counsel testified before this Court that the existence of such evidence was not sought. The conclusion that there is a substantial likelihood the result would have been different had *something* been presented in favor of life is, to this Court, inescapable.

■ Although the failure to present the aforementioned evidence undermines this Court's confidence in the sentencing portion of petitioner's trial, the balance of petitioner's allegations of ineffective assistance do not. As to any testimony from family members, the evidence at the hearing revealed that counsel had considered speaking with Bolder's family members, but that Bolder had instructed him not to. Counsel for petitioner was reasonable in heeding petitioner's request. *See Hayes v. Lockhart*, 852 F.2d 339 (8th Cir.1988), *reh'g*

---

**9.** The Court finds as fact that counsel did not understand that he could present non-statutory mitigating circumstance evidence in defense of petitioner. Under questioning at the 27.26 hearing, counsel stated that "I did not see any mitigating circumstances *set forth in the statute* that I could present to the jury." *Respondent's Exhibit 6* (Transcript of Rule 27.26 Hearing) at 111 (emphasis supplied). This conclusion is bolstered by counsel's testimony at the hearing on the instant petition:

Q. Did you tell him if you thought there was any evidence other than the family that could be put on for him in that part of the trial?
A. I could not really find any evidence that I thought I could present on his defense in that phase of·the trial that would not open the way

for the prosecutor to bring up other information that was damaging and that I felt was damaging to the extent that it would offset any positive gain we'd get from any mitigating evidence.
Q. What kind of information are you talking about, sir, that would damage—
A. Well, for instance his age, the psychiatric report that we had available. Those were mainly the two things that I really—about all I had to present.
Transcript at 112–13. Obviously,·a misinterpretation of the controlling law cannot yield a decision based on professionally reasonable judgment. *See* Mo.Rev.Stat. 565.012.1(3) (1978) which permitted "any mitigating or aggravating circumstance otherwise authorized by law."

**1568**

*denied,* 869 F.2d 358 (1989) (petition for certiorari filed March 2, 1989).[10]

██ Any evidence of Bolder's good character as a young child would have opened the door to damaging cross-examination as to Bolder's criminal record and bad acts as a child. Even though petitioner's counsel did not consider offering such evidence, its failure to be admitted at trial at the sentencing phase does not undermine this Court's confidence in the proceedings.

██ Likewise, any evidence contained in the psychological report would have minimally assisted petitioner at the sentencing. Although counsel for petitioner asserts otherwise, petitioner contends that evidence of his learning deficiency contained in the report could have been admitted during the sentencing phase without the admission of damaging evidence on cross-examination.[11] This Court agrees, but does not assign the significance to that evidence that petitioner does.

██ It is clear from the prevailing rules of evidence that counsel for petitioner could have inquired as to the psychiatrist's opinion of petitioner's mental abilities without risking introduction of damaging aspects of petitioner's anti-social personality as well as prior criminal behavior. However, even this piecemeal inquiry into the psychological report would have opened the door for cross-examination on Bolder's responsibility for the crime. This testimony would have revealed that he had the mental capabilities to fully appreciate the nature and extent of his actions. Further, this questioning would have allowed further cross-examination as to the balance of the

mental tests performed on Bolder which all showed that he was in the normal mental range. Accordingly, the minimal benefit received from the psychological report would be more than offset from the negative aspects it invited.

██ Petitioner's assertion that his counsel was ineffective for failure to introduce evidence of the victim's propensity for violence and bad character is equally unavailing. In *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), the Supreme Court made it quite clear that evidence of a victim's good or bad character is not admissible in the sentencing phase. Although admitting evidence of bad character was not at issue in *Booth,* the Court footnoted its opinion on the issue present here:

> We are troubled by the implication that defendants whose victims were assets to the community are more deserving of punishment than those whose victims are perceived to be less worthy. Of course, our system of justice does not tolerate such distinctions.

*Id.* 107 S.Ct. at 2534 n. 8.

Juries must make an "individualized determination" of whether the defendant in question should be executed, based on "[t]he character of the individual and the circumstances of the crime." *Zant v. Stephens,* 462 U.S. 862, 879, 103 S.Ct. 2733, 2744, 77 L.Ed.2d 235 (1983) (citations omitted). In short, evidence adduced at the sentencing hearing must have some bearing on the defendant's "[p]ersonal responsibility and moral guilt." *Enmund v. Florida,* 458 U.S. 782, 801, 102 S.Ct. 3368, 3378, 73 L.Ed.2d 1140 (1982).

---

10. The evidence of Bolder's troubled childhood was not presented to this Court through the testimony of family members. Accordingly, Bolder's wish that they not be utilized did not foreclose this avenue of attack during the sentencing portion.

11. Counsel for plaintiff testified that he could not present evidence of Bolder's mental deficiencies, which were outlined in the psychiatric report, without exposing the entire report to cross-examination. The report contained damaging references to Bolder's personality traits and prior bad acts as a child. However, coun-

sel's fears were unfounded. If he merely inquired about the psychiatrist's opinion on Bolder's learning disabilities, the witness would be subject to cross-examination only as to the factual underpinnings of that opinion. The report is clear that this opinion was based on testing and not Bolder's checkered past. Accordingly, this tactical decision was not based on sound reasoning. Nevertheless, as the balance of the order will reveal, this Court does not believe the sentencing function was prejudiced by this omission.

The Court is convinced that evidence of the victim's propensity for violence and general bad character would not and should not have been admissible at petitioner's sentencing hearing. Such evidence had nothing to do with petitioner's individual characteristices or moral responsibility for the crime.

Although the evidence in this case showed there was animosity between the petitioner and the victim, the Court is not persuaded that this evidence would have been helpful to petitioner. Petitioner is, in effect, arguing that his counsel was ineffective for failing to adduce evidence at the sentencing hearing that the victim had accused the petitioner of engaging in homosexual relations with other inmates. Self-defense was not an issue in the guilt phase of petitioner's trial. Indeed, petitioner's defense was innocence. Accordingly, any assertion by petitioner during the sentencing phase that there was some justification for his crime would have been antithetical to his assertion of innocence, and would have undermined his credibility in front of the jury.

Petitioner's assertion that counsel was ineffective for failing to introduce evidence of his environment at the pentitentiary is equally unavailing. Counsel testified, and it is supported by the record, that he considered presenting evidence through inmates that petitioner had a difficult time in prison. The evidence would have shown that because petitioner was incarcerated at a young age, he fell prey to beatings and homosexual advances while in custody. However, counsel testified that because the evidence would have had to have been presented at trial through inmate witnesses who had convictions for murder, he felt the benefit of such testimony would be outweighed by the damaging cross-examination that would be sure to follow with respect to their criminal records. Such a consideration falls within the wide deference given to counsel under *Strickland.*

Likewise, any allegation of ineffectiveness based on the failure to interview prosecution witnesses is also without merit. Counsel testified that he read all the internal reports generated by the Department of Corrections in which potential prosecution witnesses detailed the substance of their testimony. It was counsel's experience that inmate witnesses never varied from the stories they detailed in the internal reports. There is no evidence in the record that counsel's performance suffered at trial because he was unprepared for prosecution witnesses. Accordingly, the failure to personally interview prosecution witnesses cannot be said to fall outside the guidelines of *Strickland.*

In summation, the fact that in this case no valid mitigating evidence was presented to the sentencing jury—when valid mitigating evidence existed—deeply troubles this Court. The Court cannot escape the conclusion that this evidence would have been considered relevant to a jury shouldered with the task of determining whether a man should live or die. Because the decision not to present such evidence at the sentencing authority in petitioner's case was not supported by reasonable professional judgment, the reliability of the capital sentencing proceeding was undermined. But for defense counsel's failure to develop mitigating evidence, there is a reasonable probability that the outcome of the sentencing hearing would have been different. Counsel's conduct "[s]o undermined the proper functioning of the adversarial process" that the sentencing hearing cannot "[b]e relied on as having produced a just result." *Strickland,* 466 U.S. at 686, 104 S.Ct. at 2064. Accordingly, this Court holds that the death sentence which is the product of this proceeding must be vacated.

### III. *Confession the Product of Coercion*

Petitioner contends that his oral confession to the murder of Theron King was improperly introduced at trial. The Missouri Supreme Court exhaustively analyzed the factual underpinnings of this claim. As this Court is required to presume those factual findings of the state court correct, a recitation of that section of the Missouri Supreme Court opinion is appropriate:

Appellant contends that the trial court erred in overruling his motion to sup-

press the oral statement that he made to investigator Lock the afternoon of the stabbing. He claims (1) that the oral statement was made after he had refused to make a written statement and after he had already cut off interrogation with one officer; (2) that he made the statement under duress and coercion and was not advised of his right to remain silent; and (3) that he made no knowing and intelligent waiver of his right to remain silent and that the trial court failed to find his statement was voluntary.

Appellant's view of the facts is contrary to the uncontradicted testimony elicited at the suppression hearing. Appellant bases his first argument upon the statement in *Miranda v. Arizona*, ... that

> [O]nce warnings have been given the subsequent procedure is clear. If the individual indicates in any manner at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege....

Yet the uncontradicted testimony showed that when investigator Lock told the appellant that he wanted to talk with him about the stabbing, appellant replied that he wanted to talk with Lt. Looten. Appellant at that point would not speak with investigator Lock, but his statement cannot be construed as an indication that he desired to remain silent. He wanted instead to speak with another officer. Appellant was advised of his rights and made a knowing and intelligent waiver of his right to remain silent. After speaking with Lt. Looten, appellant said he was ready to make a statement and Investigator Lock thereupon was summoned back into the room. Appellant was read his rights, said he understood them, and signed the waiver. There was no coercion by the authorities. Lt. Looten testified that appellant was not shackled during the interrogation, and Investigator Lock testified that no promises were made and that appellant was not beaten, struck or otherwise threatened or coerced. Appellant's refusal to

make a written statement has in this situation no bearing on the voluntariness of his oral statement. Investigator Lock testified that appellant "said he would not [make a written statement], he did not like to give written statements and he just as soon tell Lt. Looten and I what occurred and leave it at that."

*State v. Bolder*, 635 S.W.2d 673, 689 (Mo. 1982) (en banc).

■ In addressing this issue, this Court is faced with two tasks. First, the Court must ascertain what facts were found by the state trial and appellant courts and are thus presumed correct. 28 U.S.C. § 2254; *Sumner v. Mata*, 449 U.S. 539, 547, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981). Second, assuming those state court factual findings fairly supported by the record as true, the Court must determine as a question of law whether those facts warrant the conclusion that the petitioner's confession was coerced. *See Miller v. Fenton*, 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985); *United States v. Wilson*, 787 F.2d 375, 380 (8th Cir.), *cert. denied*, 479 U.S. 857, 107 S.Ct. 197, 93 L.Ed.2d 129 (1986). The facts outlined above are fairly supported by the record. Accordingly, the Court will determine if the confession was properly admitted.

■ To determine if a confession is voluntary, the Court will look to the totality of the circumstances, examining the tactics used by the police, the details of the interrogation, and any characteristics of the accused that might cause his will easily to be overborne. *Rachlin v. United States*, 723 F.2d 1373, 1377 (8th Cir.1983).

The Court notes that in *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986), the Supreme Court found that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the due process clause to the Fourteenth Amendment." In *Connelly*, the Court ruled admissible a confession that was the product of psychosis rather than the product of coercive tactics by the police. The Court observed that "the Fifth

Amendment privilege [against self-incrimination] is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.' " *Id.* 107 S.Ct. at 523 (quoting *Oregon v. Elstad*, 470 U.S. 298, 305, 105 S.Ct. 1285, 1290, 84 L.Ed.2d 222 (1985)).

The Eighth Circuit has read *Connelly* as holding that an incriminating statement cannot be found 'involuntary' in the constitutional sense unless it has been established that the state extorted it from the accused by coercive action. *United States v. Rohrbach*, 813 F.2d 142, 144 (8th Cir. 1987), *cert. denied*, 482 U.S. 909, 107 S.Ct. 2490, 96 L.Ed.2d 381 (1987).

Petitioner contends that coercive activity is present in this case. Specifically, the petitioner contends that the implied promise by Lieutenant Looten that "it would be easier for him" if he told the truth, constituted an implied promise and hence rendered his confession involuntary.

At the hearing to suppress these statements, Lieutenant Looten detailed what was said during the interrogation. The lieutenant and petitioner spoke for less than a minute. The lieutenant informed the petitioner that it would be better for him if he told the truth, because if he did not, the truth would come out some other way. Looten did not advise petitioner of his rights. Petitioner said he was ready to make a statement, and Looten called Lock back into the room. Lock then read petitioner his *Miranda* rights. Before petitioner made any statement, he indicated to the correction employees that he understood his rights. Petitioner was asked to sign a consent form, which he did. After signing the form, he made the statement at issue here.[12]

■ It is this Court's opinion that no promise of leniency was made to the petitioner in exchange for his confession. At best, the corrections officers may well have told petitioner that it was in his best interest to cooperate. However, there is no indication that the corrections officers made any direct or implied promises, or engaged in coercive tactics or threats. At worst, the petitioner's statements were offered in the hope of leniency rather than as a response to a promise of leniency. *See Rachlin v. United States*, 723 F.2d 1373, 1378 (8th Cir.1983).

Petitioner's citation to *McLallen v. Wyrick*, 498 F.Supp. 137 (W.D.Mo.1980) is unavailing. In that case, the prosecuting attorney had made a promise of leniency if the defendant confessed. The defendant rightfully assumed that that promise of leniency would be realized. Pivotal to that case was the fact that it was the prosecuting attorney, the person empowered to make and carry out such a promise of leniency, that made the promise to the petitioner. Therefore, the defendant was justified in believing that the promise would be made good. In this case, however, the corrections officers had no authority over the final disposition of this case. Nor could Bolder make any legitimate claim that he believed they had that power. As the Third Circuit Court of Appeals in *United States v. Fraction*, 795 F.2d 12 (3d Cir.1986), stated:

> In this context a 'promise' is an offer to perform or withhold some future action within the control of the promissor, and circumstances where the resulting action

---

**12.** During the penalty phase of trial, Lock read into evidence the contents of the Miranda warnings and waiver:

> Before answering any questions, you must understand your rights. You have the right to remain silent. Anything you can say can be used against you in a court of law. You have a right to talk to an attorney for advice before any questions and if you desire you may have him present during questioning. If you cannot afford an attorney, one will be appointed to represent you before any questioning. If you decide to answer questions without an

attorney present, you still have the right to stop answering at all times and talk to your attorney.

After the waiver of rights was read to the petitioner, he signed a form which stated:

> I read the statements of my rights and understand what my rights are. I am willing to make a statement and answer questions. I do not want an attorney present at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind have been used against me.

or inaction will have an impact upon the promisee, a promise is not the same thing as a prediction about future events beyond the parties' control or regarded as inevitable. The issue, then, is whether, from the perspective of the defendant, [the agents] statements included a promise of a benefit which, in the defendant's understanding, the agent could either grant or withhold.

*Id.* at 15.

There is no such evidence here.

### IV. *Jury Instruction Error*

Petitioner contends there was error of constitutional dimensions in the submission of Instructions No. 19, 20 and 22 to the jury during the sentencing phase of his trial for capital murder. The relevant instructions submitted were as follows:

#### Instruction No. 19.

If you find and believe from the evidence beyond a reasonable doubt that the circumstances submitted in Instruction No. 18 exists and that it is an aggravating circumstance, it will then become your duty to decide whether a sufficient aggravating circumstance or circumstances exist to warrant the imposition of death as punishment of defendant. In deciding that question, you may consider all of the evidence relating to the murder of Theron King.

You may also consider the aggravating circumstance referred to in Instruction No. 18 which you found beyond a reasonable doubt.

You may also consider the following circumstance if you find from the evidence beyond a reasonable doubt that it exists and that it is an aggravating circumstance: that the defendant has a prior criminal conviction for murder in the first degree.

If you do not unanimously find from the evidence beyond a reasonable doubt that a sufficient aggravating circumstance or circumstances exist to warrant the imposition of death as defendant's punishment, you must return a verdict fixing his punishment at imprisonment for life by the Division of Corrections without eligibility for probation or parole

until he has served a minimum of 50 years of his sentence.

#### Instruction No. 20.

If you decide that a sufficient aggravating circumstance or circumstances exist to warrant the imposition of death, as submitted in Instruction No. 19, it will then become your duty to determine whether a sufficient mitigating circumstance or circumstances exist which outweigh such aggravating circumstance or circumstances so found to exist. In deciding that question, you may consider all of the evidence relating to the murder of Theron King.

You may also consider any circumstances which you find from the evidence on extenuation or mitigation of punishment.

If you unanimously decide that a sufficient mitigating circumstance or circumstances exist which outweigh the aggravating circumstance or circumstances found by you to exist, then you must return a verdict fixing defendant's punishment and imprisonment for life by the Division of Corrections without eligibility for probation or parole until he has served a minimum of 50 years of his sentence.

#### Instruction No. 22.

You will be provided with forms of verdict for your convenience. You cannot return any verdict as the verdict of the jury unless all twelve jurors concur and agree to it, but it should be signed by your foreman alone.

If you decide after considering all the evidence and instructions of law given to you that the defendant must be put to death for the murder of Theron King, your foreman must write into your verdict the aggravating circumstance submitted in Instruction No. 18 which you found beyond a reasonable doubt. In addition, your foreman must write into your verdict the other specifically mentioned aggravating circumstances submitted in Instruction No. 19 which you found beyond a reasonable doubt.

If after considering all the evidence and instructions of law, you decide that the defendant must be punished for the murder of Theron King by imprisonment for life by the Division of Corrections without eligibility for probation or parole until he has served a minimum of 50 years of his sentence, your foreman will sign the verdict forms so fixing the punishment.

.　　.　　.　　.　　.

Petitioner's arguments with relation to these instructions will be addressed in order. First, as to Instruction No. 19 and 20, petitioner contends that the language "you may consider all the evidence relating to the murder of Theron King" did not specifically channel the jury's sentencing determination and, in effect, gave the jury unfettered discretion in imposing the punishment of death.

In *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the Supreme Court held that the penalty of death may not be imposed under sentencing procedures that create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner. A capital sentencing scheme must, in short, provide a "[m]eaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not." *Gregg v. Georgia*, 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976) (citation omitted). Petitioner, relying on this principle, contends that permitting the jury to consider any and all factors in the murder of Theron King permitted just such unfettered discretion.

██ According to Missouri law, capital sentencing is essentially a two-stage process. The first, or threshold, stage is the determination by the sentencer as to whether at least one "statutory aggravating circumstance" is supported by the evidence beyond a reasonable doubt. *See State v. Bolder*, 635 S.W.2d 673, 683 (Mo. 1982) (en banc). Because the sentencer must conclude that at least one of these special factors selected by the legislature exists before the death penalty can even be considered, the Missouri capital punishment scheme adequately channels the discretion of the sentencer on the issue of when capital punishment is available. It does not matter how many statutory aggravating circumstances are found as long as one of them is valid and is supported by the evidence at trial. *State v. Gilmore*, 697 S.W.2d 172, 176 (Mo.1985) (en banc), *cert. denied*, 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986) (citations omitted); *State v. Malone*, 694 S.W.2d 723, 728 (Mo. 1985) (en banc), *cert. denied*, 476 U.S. 1165, 106 S.Ct. 2292, 90 L.Ed.2d 733 (1986).

██ Once this threshold has been crossed, the purpose of the statutory aggravating circumstance has been served. The question at this point is no longer whether the death penalty can be imposed but whether it should be imposed. The sentencer makes the latter decision by considering all the evidence before it for facts which may exist in aggravation or mitigation of punishment. *State v. Shaw*, 636 S.W.2d 667, 675 (Mo.1982) (en banc), *cert. denied*, 459 U.S. 928, 103 S.Ct. 239, 74 L.Ed.2d 188 (1982). It is these evidentiary facts that are considered by the sentencer in determining whether a death sentence should be imposed. It is at this juncture that the jury may consider "all of the evidence relating to the murder of Theron King."

Hence, the threshold issue of whether or not capital punishment is even available is answered in a manner consistent with *Gregg v. Georgia*. It is the ultimate question of whether in this particular case the capital punishment is the appropriate sanction that the universe of facts available to the jury is taken into account. However, under no circumstance is the jury obligated to impose death, and the jury was so instructed. The challenged instructions are consistent with Supreme Court precedent. The passage of Instruction 19 and 20 properly instructed the jury to consider all the relevant facts in its determination of punishment. Petitioner's contention of error is without merit.

██ Petitioner's second attack on Instruction 19 centers on the consideration of

his prior murder conviction in the sentencing determination. Petitioner alleges that as a matter of Missouri state law, his prior conviction was not a proper consideration. Further, petitioner asks this Court to disregard the Missouri Supreme Court's ruling in *State v. Grubbs*, 724 S.W.2d 494, 500 (Mo.1987) (en banc), *cert. denied*, 482 U.S. 931, 107 S.Ct. 3220, 96 L.Ed.2d 707 (1987), contrary to this position. The underlying flaw in petitioner's argument is that it asks this Court to interpret Missouri state law on the issue of what is a valid aggravating circumstance in Missouri. This Court has no power to modify a state court's construction of state law under 28 U.S.C. § 2254(a). *See Cox v. Hutto*, 589 F.2d 394, 395 (8th Cir.1979).

Petitioner's third argument alleges that Instructions 19 and 20 were erroneous in that they failed to include the statutory mitigating factor of petitioner's age. Initially, it should be noted that the Supreme Court has never attempted to prescribe the precise form that state jury instructions must take. *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) only requires that the jury be given specific guidance in reaching its sentencing decision. *Id.* at 195, 96 S.Ct. at 2935. Missouri's capital sentencing structure satisfies this standard. Here, the jury's decision to return a verdict of death was adequately channelled by the necessity that they find the statutory aggravating factor of incarceration before capital punishment could be considered.

■ Petitioner's assignment of error in the failure to include the statutory mitigating factor of his age is unavailing for several reasons. First, the propriety of including a mitigating factor in the submitted instructions is purely a matter of state law and not cognizable in federal habeas review. *See, e.g., Briley v. Bass*, 750 F.2d 1238, 1244 (4th Cir.1984), *cert. denied*, 470 U.S. 1088, 105 S.Ct. 1855, 85 L.Ed.2d 152 (1985). Second, the defense did not seek the instruction nor did it offer any evidence

on the issue. Accordingly, this claim is without merit.

Finally, petitioner contends that Instruction No. 22 was prejudicial in that it presumed to find the aggravating circumstance of his prior conviction. Reference to the instruction clearly shows that the jury could only consider those aggravating circumstances they found beyond a reasonable doubt. Consequently, any contention that the Court presumed a statutory aggravating circumstances to exist in the instructions is meritless.[13]

### V. *Proportionality Review*

■ Petitioner's fourth ground for relief is an allegation that the Missouri Supreme Court proportionality review was improper. Petitioner in effect argues that the sentence in this case is disproportionate to the sentences in other similar murder cases in Missouri. Because Missouri's sentencing statute adequately channels the sentencing authority, petitioner cannot base a constitutional claim on the argument that his case differs from other cases in which defendants also received the death penalty. When, as in this case, statutory procedures under which the petitioner is sentenced adequately channel the sentencer's discretion, proportionality review is not constitutionally required. *Pulley v. Harris*, 465 U.S. 37, 50–51, 104 S.Ct. 871, 879–880, 79 L.Ed.2d 29 (1984).

■ Further, because Bolder's sentence was imposed under a Missouri sentencing procedure that focuses the sentencer's discretion on the particularized nature of the crime and the particularized characteristics of the individual defendant, *Gregg v. Georgia*, 428 U.S. at 206, 96 S.Ct. at 2940, this Court may lawfully presume that Bolder's death sentence was not "[w]antonly and freakishly impos[ed]," *Id.* at 207, 96 S.Ct. at 2941, and thus the sentence is not disproportionate within any recognized meaning under the Eighth Amendment. *See McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 1775, 95 L.Ed.2d 262 (1987). Accord-

---

**13.** The state asserts that any consideration of these issues is procedurally barred. Once again, because this is a death case, the Court prudentially decides to reach the merits of these issues in any event.

ingly, petitioner's fourth assignment of error is without merit.

## VI. *The State Impermissibly Excluded all Veniremen who Expressed Reservations about the Death Penalty by Peremptive Challenge even Though They Would Have Been Able to Abide by the Juror's Oath*

 Petitioner's fifth argument relies on *Brown v. Rice*, 693 F.Supp. 381 (W.D.N.C.1988). In *Brown*, the district court, drawing an analogy to *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), concluded that it was unconstitutional for prosecutors to consistently use peremptory challenges to exclude potential jurors who express reservations about capital punishment so as to produce a jury that is uncommonly willing to condemn a man to death.[14] The *Brown* court concluded that to establish a prima facia Sixth Amendment violation, the capital defendant must show that the prosecutor exercised his peremptory challenges to remove from the venire all members who were non-*Witherspoon* excludable, i.e. opposed to the death penalty but able to uphold the juror's oath and abide by the law as instructed by the court. The burden would then shift to the state to come forward with a neutral explanation for challenging the jurors. *Brown*, 693 F.Supp. at 393.

Petitioner contends that both jurors that expressed reservations about capital punishment were improperly excluded by use of peremptory strike. The following exchange occurred at trial between the prosecutor and juror No. 3 (Brook):

Q: Mrs. Brook, once again, the fact that the death penalty is there, would that influence your ability to judge the innocence or guilt based on the facts?

A: I don't think it would effect me. I would probably have to put that part out of my mind while I am listening to what is going on up there, but the death penalty frightens me, I think it

would be something that I would live with the rest of my life, it might bother me.

Q: Would your scruples against the death penalty prevent you from finding someone guilty of capital murder?

A: Well, I just don't know.

Q: The fear I am not sure how to determine your view toward the death penalty. Would your view either for or against the death penalty, would that prevent you from finding someone guilty of capital murder regardless of what the evidence is?

A. I think what I hear as far as evidence that is what I have to listen to.

Q. If you decide the guilt or innocence phase on the facts—

A. Yes, on the facts, I'd have to listen to that.

Q: Are there any circumstances under which you might consider the death penalty on capital murder or would you completely eliminate it on any option no matter what the facts were?

A: It's a pretty hard question. You mean can—Well, can you explain it better to me on that?

Q: Assume if you found someone guilty of capital murder, would you even consider a death penalty no matter what the circumstances might be or would you completely eliminate it as an option of punishment no matter what the facts are?

A: I really don't know.

The voir dire continued, and Juror No. 19 (Cozad) gave the following responses to the same line of questioning:

Q: Ma'am, would your beliefs and your view, would you be permitted from finding someone guilty of capital murder?

A: I don't know what I would do, but I think it would bother me. I just don't think I could do it regardless, I wouldn't be a part of sending someone

---

**14.** In *Witherspoon,* the Court determined it was unconstitutional to exclude any juror for cause who, despite reservations about the death penalty, could still carry out their oath as a juror to

fairly weigh the evidence and return the punishment of death if the evidence warranted it. *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

to death, I think I couldn't do that and live with myself.

Q: Your view would not interfere with your being a fair and impartial juror?

A: I think I would want to be fair.

Q: To both sides?

A: Yes, but like I said, I just wouldn't want any part of that kind of a death penalty verdict.

Petitioner contends that as in *Brown,* it is clear that Jurors 3 and 19 could not have been excused for cause. Nevertheless, the prosecution achieved its end by removing from the jury all persons who expressed any feelings of reluctance about capital punishment, even though they professed an ability to be fair in their fact-finding roles. The resulting jury, therefore, was organized to return a verdict of death just as it would have been had these jurors been stricken for cause.

The Court will agree for the sake of argument that the above jurors would not be *Witherspoon* excludable. However, this Court respectfully disagrees with the rationale and holding of the *Brown* decision. Accordingly, to the extent petitioner's claim rests on the rationale of *Brown,* this Court finds it to be without merit.

There are several reasons for the Court's disagreement: First, although not at issue in *Gray v. Mississippi,* 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987), a majority of the Court made it clear that they would not adhere to such an extension of *Witherspoon.* As Justice Powell, concurring in part and concurring in the judgment, stated:

> There can be no dispute that a prosecutor has the right, indeed the duty, to use all legal and ethical means to obtain a conviction, including the right to remove peremptorily jurors whom he believes may not be willing to impose lawful punishment. Of course, defense counsel has the same right and duty to remove jurors he believes may be prosecution-oriented. This court's precedents do not suggest that the *Witherspoon* line of cases restricts the traditional rights of prosecutors and defense counsel to exercise their peremptory challenges in this manner.

107 S.Ct. at 2058 (Powell, J., concurring in part and concurring in the judgment).

As Justice Scalia, speaking for four justices in dissent, stated:

> Finally, I cannot omit commenting upon the plurality's *dictum* implying that it is unconstitutional for prosecutors to use peremptory challenges consistently to exclude potential jurors who express reservations about capital punishment. I disagree. Prosecutors can use peremptory challenges for many reasons, some of which might well be constitutionally insufficient to support a legislative exclusion. For example, I assume that a state could not legislate that those who are more sympathetic toward defendants than is the average person may not serve as jurors. That surely does not mean that prosecutors violate the constitution by using peremptory challenges to exclude such people. Since defendants presumably use their peremptory challenges in the opposite fashion, state's action simply does not result in juries "deliberately tipped toward" conviction. The same reasoning applies to the exercise of peremptory challenges to remove potential jurors on the basis of the perceived likelihood that they would vote to impose a death sentence.

107 S.Ct. at 2062 (Scalia, J., dissenting). This Court agrees with the dissent and concurrence in *Gray,* in that the use of peremptory challenges does not implicate the same concerns articulated in *Witherspoon.* In short, the offsetting effect of defense peremptory challenges coupled with their limited number erradicates the concerns the Court expressed in *Witherspoon* in that the resulting jury cannot necessarily be said to be tilted in favor of death. Defense counsel is presumably using their peremptory strikes in a manner to insure the jury is more predisposed towards life. Further, the prosecutor who exhausts his peremptory strikes on jurors that may be tilted towards life has no guarantee that the jurors who replace them will be more predisposed towards death. The concern of the *Witherspoon* court rested, in part, on the unlimited number of strikes

for cause available to the prosecution. There is no such concern with peremptory challenges as they are limited in number.[15]

## VII. *Missouri Statute Prescribing Bifurcated Trials in Capital Murder Cases Violates Petitioner's Fifth and Sixth Amendment Rights*

The Missouri statutory scheme in capital murder cases sets forth a bifurcated trial system in which defendants who are convicted must resume trial immediately and be subjected to a sentencing hearing. *Mo. Rev.Stat.* § 565.006.2 (1978) (repealed effective 1984) (current version Mo.Rev.Stat. § 565.030 (1986)). The latter hearing is convened for the purpose of determining whether the death penalty should be imposed and, accordingly, evidence is admissible on the issue of mitigation and aggravation. Mo.Rev.Stat. §§ 565.006.2 and 565.-012 (1978) (repealed effective 1984) (current version Mo.Rev.Stat. § 565.030.4).

The petitioner contends that the statute as applied subjects a criminal defendant to an unanticipated proceeding (the sentencing hearing) and denies him of his Fifth Amendment right against self-incrimination. Specifically, the defendant contends he was deprived of a meaningful decision whether to testify in the guilt phase of the trial because he did not know whether he would later testify on the issue of extenuation and mitigation. Petitioner contends that he was therefore denied his privilege to testify in his own defense.

Furthermore, petitioner contends that the statutory scheme impaired the ability of defense counsel to effectively represent him. Petitioner argues that the successive trials which were held pursuant to then § 565.006 precluded counsel from making intelligent tactical decisions as to the conduct of the trial. As a result, the petitioner contends, he has been denied his Sixth Amendment right to counsel.

The Court finds no substance in petitioner's Fifth Amendment claim. Petitioner has failed to allege, and this Court fails to see, how the bifurcated trial system impinges on his right *not* to testify. The statute may indeed burden petitioner's decision *to* testify, but this does not implicate the Fifth Amendment.[16]

As to petitioner's allegations surrounding the fairness of the bifurcated trial system, the Court need only quote *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976):

When a human life is at stake and when the jury must have information prejudicial to the question of guilt but relevant to the question of penalty in order to impose a rational sentence, a bifurcated system is more likely to ensure elimination of the constitutional deficiencies identified in *Furman* [*v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).]

*Id.* at 191–92, 96 S.Ct. at 2934 (footnote omitted).

The United States Supreme Court has not only given its approval to the bifurcated proceeding but has suggested that it is a protection of the highest order in capital sentencing. Accordingly, Missouri's bifurcated trial system does not violate defendant's constitutional rights.

As to the allegations of impairment of right to counsel, the plethora of procedural safeguards surrounding the death penalty guilt and sentencing phase insure that counsel will not face surprise. Counsel will only be faced with those ag-

---

**15.** Respondent contends this claim is procedurally barred because it was not raised in any state proceedings. However, cause exists under *Wainwright* because the legal underpinnings of this claim were unavailable at the time petitioner exhausted his state remedies. *See Reed v. Ross*, 468 U.S. 1, 16, 104 S.Ct. 2901, 2910, 82 L.Ed.2d 1 (1984). However, as previous discussion reveals, this Court does not believe petitioner's claim is cognizable. Accordingly, there has been no prejudice.

**16.** The record in this case belies any assertion that the decision not to testify was an uninformed, spur-of-the-moment decision. As the state 27.26 hearing court found: "Counsel ... did not refuse to call movant as a witness, but conferred with movant who concurred with counsel's decision not to call movant." *Respondent's Ex. F–1* (27.26 Hearing, Findings of Fact and Conclusions of Law) pg. 46. This finding is supported by the record.

gravating circumstances that were made known to him prior to trial.[17] He surely is on notice that a death penalty hearing will follow after a finding of guilt on capital murder.[18] Consequently, counsel has adequate opportunity to make important decisions about trial strategy pretrial or in trial preparation when they should be made. Petitioner's Sixth Amendment argument is without merit.

## VIII. *Petitioner's Right to a Fair Trial was Abrogated by the Trial Court's Refusal to Entertain his Motion for a Continuance and by his Appearance before the Jury in full Restraint wearing Prison Clothing and Under Guard*

The historical factual findings of the Missouri Supreme Court on this issue are entitled to a presumption of correctness. 28 U.S.C. 2254(d). Accordingly, the Missouri Supreme Court's holding on this issue is set out as follows:

> Appellant's trial began May 5, 1980. At a conference before voir dire, appellant orally request a continuance in order to interview four potential witnesses, all inmates in the penitentiary. Appellant's appointed counsel stated that he had told appellant that appellant would present no evidence until at least May 6. The trial court denied the continuance and indicated that it would issue subpoenas for the four potential witnesses so that they would be available for interviewing the morning of May 6. We cannot say that the trial court abused the sound discretion it has in determining whether to grant a continuance in a criminal case ...
>
> The trial court also has discretion whether to order a defendant restrained whenever it is necessary to maintain order and security in the court room ... Given appellant's recalcitrance, the trial court was justified in ordering appellant bound. Appellant, upset with the trial court's refusal to grant the continuance

and remove appellant's appointed counsel, overturned a library table in the pretrial conference and scuffled with guards approximately five minutes; knocked over his chair in the court room while attempting to rise, and had to be subdued by guards; resisted being placed in his chair required four guards to hold him; and continually asserted that he would not remain in the courtroom. The trial court repeatedly told appellant that he would not be bound if he promised to behave. He did not. Appellant contends, nevertheless, that he should not have been shackled past the first day of trial. Given appellant's actions and the fact that appellant had been convicted of one murder and was on trial for another, the trial court could reasonably believe that another disturbance might be forthcoming if appellant was not bound. Furthermore, there was no evidence of prejudice. The trial court did not abuse its discretion.

Appellant was not compelled to appear before the jury in identifiable prison clothing ... Appellant was offered civilian clothing but he said there was none his size and that he was 'not going to put no [sic] small clothes on.' At another point before the trial, the court asked appellant whether he wished to put on civilian clothing before he went into the court room, and appellant, non-responsive, replied 'I am not going into the court room.' Appellant at no time objected to wearing prison clothes during the trial. [The] failure to make an objection to the court as to being tried in such clothes, for whatever reasons, is sufficient to negate the presence of compulsion necessary to establish a constitutional violation." *Estelle v. Williams*, 425 U.S. 501, 512, 96 S.Ct. 1691, 1697, 48 L.Ed.2d 126 (1976).

*State v. Bolder*, 635 S.W.2d at 687–88 (footnote omitted).

---

**17.** Mo.Rev.Stat. § 565.006.2 (1978) (repealed 10/1/84) (new section Mo.Rev.Stat. § 565.030 (1986).

**18.** Mo.Rev.Stat. §§ 565.006 and 565.008 (1978) (repealed 10/1/84) (new sections Mo.Rev.Stat. §§ 565.030 and 565.032 (1986)).

The Missouri Supreme Court found no prejudice to defendant due to his appearance:

> The jurors questioned under oath during the hearing on the motion for new trial said that they had not discussed the facts that appellant was shackled and an armed guard was present and those facts did not influence their decision. The four venirewomen who indicated on voir dire that the presence of the guard would affect their impartiality did not serve on the jury.

*State v. Bolder,* 635 S.W.2d at 688 n. 11.

■■■ The facts outlined above found by the Missouri Supreme Court are fairly supported by the record. The record in this case indicates more than adequate justification for the appellant to be handcuffed and restrained during the trial. Further, petitioner has no one to blame but himself for his appearance in prison garb during his trial for murder. Petitioner's allegation of error on these claims is without merit.

## IX. *Witherspoon Claim*

■■■ In a case involving capital punishment, the prosecution may not seek to remove potential jurors for cause simply because they express generalized opposition to the death penalty. *Witherspoon v. Illinois,* 391 U.S. 510, 522, 88 S.Ct. 1770, 1777, 20 L.Ed.2d 776 (1968). A juror may not be challenged for cause based on his views about capital punishment unless those views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (quoting *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)). *See also Gray v. Mississippi,* 481 U.S. 648, 107 S.Ct. 2045, 2056, 95 L.Ed. 2d 622 (1987).

Petitioner contends that Juror No. 2 was improperly excluded by the trial court. Petitioner claims Juror No. 2 was clearly equivocating as to the strength of her opposition to the death penalty. She said nothing which would lead to the conclusion that she would be prevented or substantially impaired from complying with her oath as a juror.

■■■ During the voir dire of the panel at petitioner's trial the following colloquy occurred between the prosecutor and Juror No. 2:

Q. The judge told you the charge here is murder, the charge of capital murder that has been lodged against the defendant, Martsay Bolder, I indicate to you right now we intend to seek the death penalty on the case. Is there anyone here on the first row who because of either religious or moral scruples against the death penalty you don't think you would be able to find someone guilty on a charge of capital murder?

A. Yes.

Q. Let me ask you again. You indicate that because of scruples against the death penalty you don't believe you could find someone guilty of capital murder?

A. I don't think so.

Q. If the State of Missouri—if the jury returns a verdict of guilty to capital murder you go to the second phase of trial, then the issue is punishment. After the issue is presented to the jury, the jury still has to assess the death penalty of life imprisonment. Knowing that, do you think it would interfere with your ability to judge the facts on the guilt stage of capital murder?

A. Do I have to answer yes or no?

Q. You have to answer as best you can, be as truthful as you can.

A. Well, that is bad, I don't like death, but—

Q. Let me ask you this: Do you think, knowing that if your verdict is based on the fact that the death penalty is there in the background, do you think that would interfere with your inability to judge the facts, would you impose a burden of proof greater on me if the death penalty—

DEFENSE COUNSEL: I object, he is beginning to argue with the juror.

THE COURT: Sustained.

Q. Would the fact that the death penalty is there, would that affect your ability to judge the facts?

A. Yes.

The facts of this case show that Juror No. 2, although at times confused for the inartful voir dire questioning of the prosecution, finally articulated that she could not follow her oath as a juror; indeed, it is clear that the fact that the death penalty was present in this case would not only affect her abilities in the sentencing phase but would also taint her consideration of the guilt phase. It is this Court's conclusion that there was no error in excluding Juror No. 2 for cause under the *Witherspoon* doctrine.

### X. *Sufficiency of the Evidence*

Petitioner alleges there was insufficient evidence that he caused his victim's death. Specifically, petitioner claims the Court erred in overruling defendant's motion for judgment of acquittal at the close of the state's evidence and that there is no credible evidence from which the jury could find that defendant: (a) stabbed and cut Theron King; (b) intended to take the life of Theron King; (c) knew that he was practically certain to cause the death of Theron King; or (d) reflected coolly and fully upon taking the life of Theron King.

In *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the Supreme Court held that attacks on the sufficiency of the evidence of a state conviction stated a cognizable habeas corpus claim. Habeas relief will be warranted "if the record shows that no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.* at 324, 99 S.Ct. at 2791. The *Jackson* court noted that the decision of the state court is not conclusive, but it is entitled to great weight. *Id.* at 322 n. 15, 99 S.Ct. at 2790 n. 15. Additionally, the habeas court must consider the evidence in the light most favorable to the state. *Lenza v. Wyrick,* 665 F.2d 804, 812 (8th Cir.1981) (citation omitted).

A review of the record in this case in the light most favorable to the prosecution convinces this Court that a rational factfinder could readily have found petitioner guilty beyond a reasonable doubt. The Missouri Supreme Court's factual findings adequately synthesize the evidence adduced at trial and accordingly will be reproduced on this issue.

The offense occurred in the Missouri State Penitentiary. Appellant Bolder was serving a life sentence for first degree murder.

On March 14, 1979, at approximately 3:15 p.m., vocational teachers Kenneth Giboney and Arthur Luecke were returning by truck from Lincoln University. As it came around the building identified as 5A & B and headed toward the maintenance and machine shop, Giboney observed what appeared to be two inmates fighting and told Luecke to stop the truck. Both men got out of the truck some 30 feet from the altercation. They saw an inmate, later identified as Theron King, lying against the wall in a partially sitting position. A second inmate, later identified as appellant, was standing over King and making striking or stabbing motions toward King's stomach. King appeared to be trying to move from side to side in an attempt to get out of the way. An unidentified third inmate approached to within 2–3 feet of the pair and then dropped back with his arms in the air. The inmate later identified as appellant straightened up, backed away from King, and then headed toward the entrance of the 5A & B building. No others were known to be present at the scene. Neither Giboney nor Luecke saw a weapon at the time.

As appellant headed for the 5A & B building entrance, King rose and started toward the maintenance and machine shop. Luecke saw blood on King's tee shirt and pursued appellant into the 5A & B building not more than 15 seconds behind him. Burt Johnson, another corrections officer who had arrived at the scene, also entered the building and ascended the stairs in pursuit of appellant. When Johnson reached the top of the

steps he saw appellant standing behind a desk and wiping blood off his hands with a handkerchief.

Appellant was wearing green trousers and a red jacket of the same type Luecke had seen on the man standing over King and making stabbing motions at him. Blood stains on appellant's clothes were of the same type as King's blood. Johnson frisked appellant, found no weapons on him, and took him back downstairs. A weapons search was conducted in the immediate area of the stabbing. No weapon was found outside at the scene, but a clear plastic bag stained with blood of the same type as King's was found nearby. The plastic folder contained, among other things, an inmate paper and appellant's personal correspondence. Prison officials found a knife with fresh blood on it in the 5A & B building behind a set of padlocked metal doors 15–20 feet down a hallway and to the left of the entrance appellant had been seen entering. A ⅞" space separates the bottom of the door from the floor. The knife was thin enough to have been slipped beneath the doors. When an investigation of the area was completed, appellant was taken to the office of Urban Lock, penitentiary investigator, for questioning....

Dr. Richard Bowers examined King and immediately called in a surgeon, Dr. Allen Doerhoff. King was in shock when Dr. Bowers first saw him at the hospital. King had a 1–inch laceration on his right shoulder, a 2–inch laceration on his back, a 1½–inch laceration on his right wrist and a 3–inch long stab wound in his abdomen.

Dr. Doerhoff arrived at the hospital within 45 minutes after the stabbing. King's interior vena cava, which carries blood from the legs, intestines, kidneys and liver to the heart, was lacerated in the stabbing. Dr. Doerhoff had to massage King's heart with his hand in order to start it pumping again. Because of the seriousness of the wound, Dr. Doerhoff held the inferior vena cava shut with his hand while King was moved into the operating room....

Dr. Doerhoff testified that such a serious injury to the inferior vena cava is fatal 90% of the time. The emergency was so great that Dr. Doerhoff did not believe he had time to establish a sterile condition and still save King's life. He performed the operation on King without wearing a mask or cap, although he did wear sterile surgical gloves....

King died April 28, 1979. Dr. Larry Arnold, who performed the autopsy on King's body, testified that in his medical opinion King died from a generalized infection caused by a stab wound to the abdomen.

Petitioner later confessed to the crime. Further, he told Investigator Lock that the incident between the petitioner and King went back four to six months when King was his cellmate. Petitioner said that King knew who murdered his brother but would not tell him. A new inmate became petitioner's cellmate after King moved out. Thereafter, King began harrassing petitioner and telling others that petitioner and his new cellmate were engaged in homosexual activities. Petitioner made it clear that he was tired of such accusations. He stated that on March 14, he was walking to the 5A & B building when he saw King and another inmate sitting on the ledge. They called petitioner names as he walked by, and an argument followed. Petitioner said he did not like being called names. He left to return to the yard with a plastic bag containing papers and correspondence. He got the knife, put it in the plastic bag, and returned to where King was. Petitioner asked King what he had said earlier, and King called him "a pussy-assed nigger." Petitioner then pulled out the knife and stabbed King.

The testimony and exhibits offered at trial support the Missouri Supreme Court's recitations of the facts of this case. In Missouri, the testimony of a single witness is sufficient to establish the identity of a criminal defendant if the jury believes it beyond a reasonable doubt. *State v. Tucker,* 451 S.W.2d 91, 95 (Mo.1970). In this case, not one but two witnesses observed petitioner standing over King making strik-

ing and stabbing motions. Petitioner was found wiping blood off his hands with a handkerchief. Further, his clothes were the same type that King's assailant was reported as wearing. The stains on his clothing were blood of the same type as King's.

As to petitioner's allegations that there was no evidence of intent, the knife wound in King's abdomen severed one of the major blood vessels in the body, and "[a] killing by the use of a deadly weapon on a vital part of the body of the victim is sufficient to permit a finding of intent to kill." *State v. Strickland,* 609 S.W.2d 392, 394 (Mo.1980). Further, the fact that King died from an infection rather than the stabbing itself is irrelevant. The petitioner is legally responsible. *See State v. Brandt,* 467 S.W.2d 948, 950 (Mo.1971).

Third, it is reasonable to believe the jury could have found the seriousness of the stab wound dispositive on the issue of whether petitioner knew he was practically certain to cause King's death.

 Finally, the evidence clearly supports a finding by the jury that the killing occurred after premeditation and deliberation, which may be inferred from circumstances of the homicide. *State v. Strickland,* 609 S.W.2d at 394. Premeditation is present whenever the defendant thinks about the act for any length of time. *Id.* Although the statement by petitioner to Lieutenant Looten to the effect that he went back to his cell to get a knife and stab King (which would obviously support a finding of premeditation) was not before the jury at the time of the guilt phase, the Missouri Supreme Court was correct in its belief that the jury nevertheless could have found premeditation from the facts that the attack occurred in an area not visible from the guard towers, prisoners are not allowed to carry weapons, and there was no evidence of bruises on either King or appellant that would indicate that an altercation preceded the stabbing. *Bolder,* 635 S.W.2d at 680. Those factors also might indicate deliberation, but, in any event, "[w]ith evidence of provocation lacking, the previously demonstrated intent to kill pro-

vided deliberation." *State v. Sturdivan,* 497 S.W.2d 139, 142 (Mo.1973) *overruled on other grounds State v. Anderson,* 515 S.W.2d 534, 542 (Mo.1974) (en banc).

### XI. *Error in the Admission of Evidence*

Petitioner contends that the state court erred in admitting in evidence the alleged murder weapon and a photograph thereof and that there was no evidence tending to prove that the exhibit had ever been in defendant's possession or that it was the weapon used to inflict the wounds to Theron King.

 Even assuming petitioner is correct in his allegation that the evidence should not have been admitted, the mere fact that a state trial court improperly excluded evidence generally will not form the basis for a writ of habeas corpus. Ordinarily, the admissibility of evidence at trial is a matter of state law and will not form the basis for federal habeas relief. *Manning–El v. Wyrick,* 738 F.2d 321, 322 (8th Cir.), *cert. denied,* 469 U.S. 919, 105 S.Ct. 298, 83 L.Ed.2d 233 (1984).

A federal court may, however, grant habeas relief where a state court's evidentiary ruling infringes upon a specific constitutional protection, or is so prejudicial that it amounts to a denial of due process. *Id.* "In making this determination courts must review the totality of the facts in the case before them and analyze the fairness of the particular trial under consideration." *Turner v. Armontrout,* 845 F.2d 165, 169 (8th Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 315, 102 L.Ed.2d 333 (1988) (quoting *Maggitt v. Wyrick,* 533 F.2d 383, 385 (8th Cir.) *cert. denied,* 429 U.S. 898, 97 S.Ct. 264, 50 L.Ed.2d 183 (1976)).

In any event, the Court is not convinced that the evidence was improperly admitted at trial. It is well-established in Missouri evidence law that articles, instruments and weapons that have a tendency to explain the manner in which a crime was committed that are found at or near the scene of the crime subsequent to the commission of crime are generally admissible. *State v.*

*Neal,* 591 S.W.2d 178, 180 (Mo.Ct.App. 1979). The key issue is whether the knife can be tied to the petitioner.

 It is true that none of the witnesses who testified at trial ever saw the knife in appellant's possession. Nevertheless, the evidence at trial linked appellant to the knife and linked both the appellant and the knife to the attack. The appellant was seen standing over the victim and making stabbing motions toward the stomach. The appellant was later found in the building wiping fresh blood off his hands. The knife was found in close proximity to the door the appellant was seen entering after he was seen standing over the victim. There was adequate room underneath the door to the room where the knife was found to allow the knife to be slid under the door. The knife was found with fresh blood on it; although it should be noted that no fingerprints were found on the knife. The blood on petitioner's clothes matched that of the victim. This evidence sufficiently linked petitioner to the weapon and the weapon to the crime. There is no error of constitutional dimension implicated in petitioner's argument.

Petitioner has raised several other issues in relation to his trial. The balance of the claims outlined in petitioner's two petitions for habeas relief have been thoroughly analyzed by this Court and found to be without merit. Because those issues have been previously addressed by other appellate courts, this Court finds no value in further discussion of them here.

Accordingly, it is hereby

ORDERED that petitioner's request for writ of habeas corpus is GRANTED. Petitioner's sentence of death is vacated. The petitioner's sentence is reduced to life imprisonment without possibility of parole for fifty years unless the state, within a reasonable time not to exceed six months, commences proceedings to re-try the question of punishment.